# JOSEPH C. STRONCEK v. BERKSHIRE LIFE INSURANCE COMPANY.

193 N. W. 2d 286.

December 17, 1971—No. 42708.

58

*Russell A. Sorenson* and *Thiel & Sorenson,* for appellant.
*Harry Sieben, Jr.,* and *Mott, Grose, Von Holtum & Sieben,* for respondent.

Heard before Knutson, C. J., and Murphy, Otis, Rogosheske, and Hachey, JJ.

RONALD E. HACHEY, JUSTICE.*

This is an appeal by defendant, Berkshire Life Insurance Company, from an order of the trial court denying its motion for judgment notwithstanding the answers to special interrogatories, or, in the alternative, for a new trial.

Plaintiff brought the action to recover monthly benefit payments and for the return of premiums paid pursuant to clauses of an insurance policy which provided for waiver of premiums and monthly benefits to be paid in the event of total disability of the insured. The matter was submitted on special interrogatories to a jury, which found that plaintiff was totally disabled. Pursuant to the jury's answers, the trial court ordered judgment for plaintiff, awarding payment of monthly benefits through March 1970 and an additional amount representing premiums plaintiff has paid since becoming totally disabled.

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

Total disability is defined in the policy in part as follows:

"Total disability means that, as a result of bodily injury or disease, the Insured is wholly unable to engage in any gainful occupation for which he is or could become qualified by reason of education, training, or experience."

Plaintiff was 49 years of age at the time of trial. He graduated from high school in 1938 and worked for his father in a cabinet shop. Over the years he worked at various places as a carpenter in construction jobs. He started his own contracting business in 1950 and his work consisted primarily of building new homes, including the drawing of plans and supervision of carpenters and subcontractors. Beginning in late 1964 and early 1965, he had symptoms of high blood pressure, fainting spells, and dry heaves, which disabilities eventually resulted in his termination of work in June 1967. In the meantime, plaintiff "passed out" a total of six times, once in 1967 before his work termination. He also experienced difficulty with his memory and lost sleep. He tried numerous types of tranquilizers, but to no avail. After quitting the contracting business, he studied in order to obtain a license to sell real estate but could not attempt the examination because of his memory problem. Upon physical exertion, he becomes short of breath. He is continually harassed by severe headaches and numbness in the arms. Prior to his termination of work, plaintiff made from $8,000 to $30,000 per year from his business.

Pursuant to the insurance policy, plaintiff received $300 per month disability benefits until October 1969. Shortly before trial, he was sent to a rehabilitation center to make application for possible training for some type of employment. The application had not been fully processed at the time of trial. Defendant contends that plaintiff is not permanently totally disabled as described in the policy and has therefore refused to pay the monthly benefits from and after October 1969 and has refused to waive payment of premiums.

▓▓ One of the claims of error relates to the admissibility of testimony of two witnesses called by plaintiff which tended to show that plaintiff was not "employable." One witness, a staff training specialist with the Minnesota Division of Vocational Rehabilitation, testified that plaintiff was unemployable for physical and emotional reasons. The other witness, an owner and manager of an employment service, also testified that in his opinion plaintiff was not employable. The opinion of the first witness was not objected to by defense counsel, and the opinion of the second witness was objected to on the grounds of lack of foundation and irrelevance. That objection was overruled. Defendant does not dispute the fact that plaintiff suffers from a disease and that the disease encompasses mental or emotional problems as well as physical. Defendant does, however, contend that the only means by which the pertinent clause can be properly interpreted is to determine whether or not plaintiff is capable of performing the tasks involved. Defendant further argues that the term "employability" as testified to by the two employment counselors has no place in the interpretation of the contract and concludes that without their testimony the jury would have had no credible testimony upon which to base a finding for plaintiff.

In Maze v. Equitable Life Ins. Co. 188 Minn. 139, 142, 246 N. W. 737, 738 (1933), we held:

"* * * [T]he words 'totally disabled' * * * are not to be literally construed so as to mean a state of absolute helplessness, but rather a state of inability to do all the substantial and material acts necessary to the carrying on of the insured's calling in substantially his customary and usual manner. * * * In other words, under such liberal construction, total disability to engage in any occupation or work for compensation or profit does not mean that the insured person must be wholly helpless. He may be able to perform some parts of an occupation, yet he may be held to be totally disabled unless he is able to perform the substantial or material parts of such gainful occupation or work

with reasonable continuity. [Citing Wilson v. Metropolitan Life Ins. Co. 187 Minn. 462, 245 N. W. 826 (1932).]"

Following that decision, and through the years, this court has constructed an elaborate framework in defining the words "total disability." In Green v. Schmahl, 202 Minn. 254, 256, 278 N. W. 157, 158 (1938), we again repeated that "although an injured person may be able to perform some parts of an occupation he may be held to be totally disabled unless he is able to perform the substantial and material parts of some gainful work or occupation with reasonable continuity."

Lee v. Minneapolis St. Ry. Co. 230 Minn. 315, 319, 41 N. W. 2d 433, 436 (1950), involved, among other things, the admissibility of the testimony of a supervisor for the Minnesota State Employment Service to the effect that jobs with reasonable continuity were not available to a person as handicapped as the plaintiff. We held:

"* * * If reasonably stable employment is not available for an employe by reason of certain injuries which have crippled him physically or neurologically, evidence of that fact—through the testimony of an experienced employment supervisor—is both material and relevant in determining whether the employe's disability is of such a character that he has no reasonable likelihood, *while such disability continues,* of being able to obtain and pursue an income-yielding occupation with reasonable continuity * * *. The purpose of the testimony is not to establish the nature of the disability or its duration, but to determine, assuming the existence of certain injuries, whether employment is available for a person so handicapped. An employe who is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled. He who has no reasonable prospect of selling his services has no material earning capacity and is substantially helpless as a self-sustaining unit of society."

See, also, Berg v. Sadler, 235 Minn. 214, 50 N. W. 2d 266 (1951). The issue of the relevance of testimony of an employment expert to the effect that the injured party was "unemployable" arose in Petter v. K. W. McKee, Inc. 270 Minn. 362, 367, 133 N. W. 2d 638, 642 (1965). In that decision, this court stated:

"* * * Prior decisions of this court, however, have made it clear that the testimony of such an employment expert is both relevant and important in determining permanent total disability. It has been held that if a man is unemployable in the labor market because of his injuries he may be held to be totally disabled even though he may be able to perform some type of work for which there is no market. [Citing Lee v. Minneapolis St. Ry. Co. *supra.*]"

■ It seems, therefore, but a small step to hold that, since the ability to be hired is relevant, if not crucial, to determining total disability, expert testimony as to the ability to be hired (as opposed to the ability to perform certain tasks) will be admissible. The trial court took that step. In its well-stated and well-reasoned memorandum accompanying the order denying defendant's post-trial motion, the trial court noted:

"* * * Although the Court would agree that we are not concerned with [how] employability as such may be evaluated for economic purposes, or for many other purposes, yet we are directly concerned with employability when attempting to determine what a specific individual, such as the plaintiff, is able to do in the light of his physical or mental condition.

"* * * It would seem to the Court unreasonable to interpret 'disability' as provided in the policy in any other manner than is related to the labor market. The provision in the policy which refers to disability specifically provides that such disability is to be determined as related to the ability of the insured to do work such as would be of sufficient worth as to merit compensation. The policy provides, 'Total disability means * * * the insured is wholly unable to engage in any *gainful occupation*

* * *.' * * * So we are not considering some abstract disability, but rather are considering disability as it relates to *gainful employment*. * * * Persons with the qualifications and experience of Mr. Homme and Mr. Steen represent the experts who can properly assist the jury in determining plaintiff's condition insofar as such physical condition may or may not affect his ability to meet the needs or even the minimum requirements of employers who may or may not be willing to furnish plaintiff an opportunity for any 'gainful occupation.' "

We agree with the trial court and do not find error in the record with respect to the admissibility of the testimony of the two employment experts.

■ Defendant contends that the verdict is not supported by the evidence and points to allegedly confusing or inconsistent testimony of plaintiff and of the medical witnesses who testified with respect to his total disability. We do not find that there was any prejudicial error. The jury was properly instructed with respect to its assignment of weighing and evaluating that evidence. That evidence, together with the evidence of the employment experts, supports the jury's finding that plaintiff was totally disabled within the meaning of the pertinent provision of the insurance policy.

In 1897, this court stated, in defining total disability:

"But the mere fact that he might be able, with due regard to his health, to occasionally perform some single and trivial act connected with some kind of business pertaining to his occupation as a merchant would not render his disability partial instead of total, provided he was unable, substantially or to some material extent, to transact any kind of business pertaining to such occupation." Lobdill v. Laboring Men's Mutual Aid Assn. 69 Minn. 14, 17, 71 N. W. 696, 697.

In Blazek v. North American Life & Cas. Co. 251 Minn. 130, 140, 87 N. W. 2d 36, 44 (1957), this court stated:

"The Lobdill case is the leading Minnesota case dealing with

the subject of total disability. The law stated therein has been cited with approval for 60 years when we have had occasion to construe total disability clauses. Of course, the jury in this case, under a charge based on the Lobdill case, might have found from the facts that the plaintiff was not totally disabled and we would not reverse its finding. But that is because we will not substitute our judgment for theirs in a case where reasonable men could differ."

Where there is ample evidence to support a jury's finding of total disability within the terms and provisions of an insurance policy that finding will not be disturbed.

■ Defendant cites as prejudicial error the following portion of final argument by plaintiff's counsel:

"* * * If people go out and buy insurance policies like this ten years before they get the symptoms that Mr. Stroncek has, and then they come in and they ask what they paid for it—over ten thousand dollars in this instance—and they don't get the benefits, what use is this policy? This policy is really worthless. Mr. Stroncek can't collect on his disability—"

Counsel for defendant objected to that portion of the argument, and the trial court made the following comment:

"I will ask that you refrain from referring to what could possibly be any conclusions drawn from the policy itself."

Nothing further was said by the court at that time or during its final instructions. Defendant contends those remarks of counsel were designed to create passion and prejudice for which there was no adequate instruction by the court, and that even had there been one, it would have been impossible to overcome their effect.

What constitutes misconduct resulting in passion and prejudice is a matter addressed largely to the discretion of the trial court. See, Knowles v. Van Gorder, 23 Minn. 197 (1876); Rheiner v. Stillwater St. Ry. & Transfer Co. 31 Minn. 193, 17 N. W.

279 (1883); Olson v. Prayfrock, 254 Minn. 42, 94 N. W. 2d 540 (1958). The trial court is in a better position to assess the impact of argument on a jury than we are. Wilson v. Sorge, 256 Minn. 125, 97 N. W. 2d 477 (1959). Generally, in Minnesota, attorneys are given reasonably wide latitude in their arguments to the jury. If an attorney presents a persuasive argument on behalf of his client, the verdict alone is not proof that the argument tended to incite passion and prejudice. The trial court in its memorandum stated as follows:

"As to the final argument of counsel it is the Court's opinion that the argument was not such as would reasonably incite the jury to passion or prejudice. Criticism of arguments of counsel is becoming so prevalent among the members of the trial bar that perhaps the time has been reached when the bar should be polled as to whether or not final arguments should be discarded. An attorney who appears to be presenting an effective argument, i. e. one which presents plausible and logical reasons for support of his client's position is today most certainly going to be interrupted by opposing counsel's plea to the Court to interfere with such 'highly prejudicial' tactics. If final arguments should no longer consist of persuasive presentations intended to influence the jury to apply the evidence to support the position of the party for whom the argument is presented, they should then be discontinued. In the Court's opinion plaintiff's counsel's argument in this case was easily within the purview intended of a final argument."

Whether remarks made in final argument require a cautionary instruction or other corrective action is a matter addressed to the discretion of the trial court. Similarly, whether to grant a new trial for misconduct of counsel rests largely in that court's discretion, and we will not reverse its determination unless the conduct is so prejudicial that it would be a miscarriage of justice to permit the result to stand. In this case the jury returned a verdict for plaintiff on the merits. It is unlikely that it would

have found against defendant entirely as a result of the statements of plaintiff's counsel which have been complained of. Olson v. Prayfrock, *supra*. From the record it appears that no prejudice which could have possibly come from the remarks of plaintiff's counsel was so great that it would warrant the granting of a new trial.

The order of the trial court is affirmed.

Affirmed.